UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL COMPLAINT** |
| | : | |
| v. | : | Hon. Lois H. Goodman |
| | : | |
| SYED M. ABBAS, | : | Mag. No. 21-5000 |
|    a/k/a "Sonny Shah," and | : | |
| MUHAMMAD NAVEED | : | |
| | : | |

I, Brian Macdonald, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Postal Inspector for the United States Postal Inspection Service, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached page and made a part hereof:

> s/Brian Macdonald
> Brian Macdonald
> Postal Inspector
> United States Postal
> Inspection Service

Inspector Macdonald attested to this Complaint
by telephone pursuant to F.R.C.P. 4.1(b)(2)(A)

February 1, 2021 at  1:05   p.m.          at     District of New Jersey

HONORABLE LOIS H. GOODMAN
UNITED STATES MAGISTRATE JUDGE          Signature of Judicial Officer

## ATTACHMENT A
(Conspiracy to Commit Bank Fraud)

From at least as early as March 2018 to in or around April 2020, in Hudson County, in the District of New Jersey, and elsewhere, the defendants,

SYED M. ABBAS,
a/k/a "Sonny Shah," and
MUHAMMAD NAVEED,

did knowingly and intentionally conspire and agree with each other and others to execute a scheme and artifice to defraud financial institutions, as defined in Title 18, United States Code, Section 20, whose deposits were insured by the Federal Deposit Insurance Corporation, and to obtain monies, funds, assets, and other property owned by and under the custody and control of such financial institutions, by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

In violation of Title 18, United States Code, Section 1349.

**ATTACHMENT B**

I, Brian Macdonald, am a Postal Inspector with the United States Postal Inspection Service ("USPIS"). I have knowledge about the facts set forth below from my involvement in the investigation, my review of reports, documents, pictures, videos, witness interviews, and discussions with other law enforcement officers. Because this affidavit is submitted for the limited purpose of establishing probable cause, I have not set forth each and every fact that I know concerning this investigation. All statements described in this criminal complaint are set forth in substance and in part. In addition, where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

**I.   RELEVANT INDIVIDUALS AND ENTITIES**

    1.   At various times relevant to this criminal complaint:

        a.   Defendant SYED ABBAS ("**ABBAS**"), a/k/a "Sonny Shah," resided in or around Westerville, Ohio.

        b.   Defendant MUHAMMAD NAVEED ("**NAVEED**") resided in or around Jersey City, New Jersey.

        c.   "Victim Bank 1," "Victim Bank 2," "Victim Bank 3," and "Victim Bank 4" (collectively, the "Victim Banks"), were "financial institutions," as that term is defined in Title 18, United States Code, Section 20, whose deposits were insured by the Federal Deposit Insurance Corporation ("FDIC"), and offered, among other things, business checking and debit accounts to commercial businesses.

        d.   Co-conspirator 1 ("CC-1"), not charged as a defendant herein, was a member of the conspiracy identified in this criminal complaint, and was an associate of defendants **ABBAS** and **NAVEED**.

        e.   Co-conspirator 2 ("CC-2"), not charged as a defendant herein, was a member of the conspiracy identified in this criminal complaint, and was an associate of defendants **ABBAS** and **NAVEED**.[1]

        f.   The "Merchant Processor" was a credit and debit card processing company that provided businesses the equipment (e.g., point-of-sale terminals) to accept electronic payments without the need for cash.

---

[1] CC-1 and CC-2 previously have been charged in connection with a separate but related criminal complaint.

    g. Speed Staffing, Inc.; Crummi, Inc.; Single Bite Catering; MS Car Repair; Zizer Apparels, Inc.; Haveli Catering, Inc.; Burger Slap; Shalimar BBQ & Curry House; SH Garden; Tandor Grill; Fashion Chirp; True Value Little Ferry Hardware Corp.; Mughal Grill Corp.; and SR Hair Salon were shell companies that had no legitimate commercial activity, and were established by members of the conspiracy for the purpose of opening bank accounts to execute the fraudulent scheme detailed herein.

## II. OVERVIEW

    2. Beginning at least as early as March 2018 and continuing through in or around April 2020, defendants **ABBAS**, **NAVEED**, CC-1, CC-2, and others (collectively, the "Criminal Organization") conspired to defraud, and did defraud, multiple banks whose deposits were insured by the FDIC.

    3. To accomplish their unlawful objectives, members of the Criminal Organization established bank accounts at retail banks and merchant processing accounts and engaged in the following activities in furtherance of the conspiracy:

    a. issued checks payable to shell companies associated with the Criminal Organization with no legitimate business activities, knowing that the payor accounts had insufficient funds, thus taking advantage of the temporary float;[2]

    b. conducted numerous debit card transactions between shell companies to fraudulently credit payee accounts and overdraw payor accounts; and

    c. used the shell companies to execute temporary refund credits, commonly referred to as "charge-backs," to checking accounts associated with the Criminal Organization, where no prior legitimate transaction had occurred.

---

[2] "Float" is money within the banking system that is briefly counted twice (between two to three days) due to time gaps in the clearing of a deposit or withdrawal. For instance, in the context of checks, a bank sometimes immediately credits the account of the check payee as soon as a check is deposited. However, it takes time for the check to clear the payor's bank account. Until the check clears the account on which it is drawn, the payable amount of the check is recorded in two different places, appearing in the both the recipient's and payor's bank accounts. As described herein, the same concept was at play here, both with checks issued from the Criminal Organization's accounts, and in the context of electronic payments executed through merchant processors. With respect to the latter, the timing in which payee accounts were credited allowed the Criminal Organization to withdraw funds credited to a payee bank account before the transaction cleared, and before the Victim Banks could determine that the transaction was fraudulent.

4.      In each one of these instances, members of the Criminal Organization withdrew the existing funds (through ATMs or bank tellers) that Victim Banks and/or the Merchant Processor had credited to the payee bank accounts at the time of the fraudulent transaction.  Because members of the Criminal Organization withdrew the credited funds from the payee accounts before the Victim Banks could recognize the fraudulent transactions, the Victim Banks were left with substantial losses.  Indeed, the investigation has identified approximately 200 bank accounts and 75 merchant processing accounts that were used to facilitate the schemes.  The Criminal Organization's unlawful activities have caused an aggregate loss to Victim Banks of over one million dollars.

5.      Based on my training and experience and what I have learned throughout this investigation, there is probable cause to believe that defendants **ABBAS**, **NAVEED**, and others agreed to and did engage in the conspiracy.  As described herein, the investigation revealed, among other things, the following: (i) members of the Criminal Organization opened multiple shell companies around the same time frame, between 2018 through 2020; (ii) some of these accounts were opened with synthetic identities[3] and were controlled by common coconspirators; (iii) coconspirators moved money through shell companies to take advantage of payee accounts being immediately credited after fraudulent transactions; and (iv) coconspirators credited fraudulent refunds to accounts of shell companies when there was no prior legitimate purchase of goods or services.

6.      Sections III and IV, below, summarize the evidence obtained during the investigation regarding the roles played by **ABBAS** and **NAVEED** in furtherance of the Criminal Organization's unlawful activities.

### III.     ABBAS Moved Money Through Shell Companies to Capitalize on the Float and Conducted Fraudulent Refund Credit Transactions When There Was No Prior Legitimate Purchase of Goods or Services.

7.      During the investigation, law enforcement identified **ABBAS** as a principal member of the Criminal Organization.  The investigation revealed, among other things, that **ABBAS** utilized one or more shell companies, including Speed Staffing, Inc. ("Speed Staffing"), to (i) deposit checks drawn on bank accounts held in the name of other shell entities associated with the Criminal Organization, and (ii) execute other merchant transactions with shell entities knowing that the payor accounts had insufficient funds to cover the transactions.   Members of the Criminal Organization overdrew the bank

---

[3] A synthetic identity is the combination of valid personally identifiable information (PII), like valid social security numbers (SSNs), with accompanying false PII, such as names and dates of births.  The investigation revealed that many of the accounts opened in furtherance of the conspiracy were opened using synthetic identities.

accounts of those shell entities by taking advantage of the temporary funds made available in the payee accounts. Examples of **ABBAS**'s activities in furtherance of the conspiracy are set forth below.

8.  On or about June 6, 2018, a bank account was opened in the name of Speed Staffing at a bank branch located in or around Columbus, Ohio, which listed **ABBAS** as the account signor (hereinafter, "Speed Staffing Account I"). On or about September 16, 2019, another account was opened in the name of Speed Staffing at a different bank branch located in or around Columbus, Ohio, which also listed **ABBAS** as the account signor (hereinafter, "Speed Staffing Account II" and together with Speed Staffing Account I, the "Speed Staffing Accounts").

9.  There is probable cause to believe that **ABBAS** controlled the Speed Staffing Accounts. Incorporation documents used to open the Speed Staffing Accounts list **ABBAS** as the president of Speed Staffing. Further, the financial institutions list **ABBAS** as the account signor for Speed Staffing. Additionally, **ABBAS** was captured by the third-party financial institution's security camera withdrawing funds from the Speed Staffing Account II.

10. The investigation revealed that the Speed Staffing Accounts were used as repository accounts for shell entities involved in the conspiracy, and that the Speed Staffing Accounts were used to funnel funds to members of the Criminal Organization. This belief is supported by the following: (i) the Speed Staffing Accounts did not have any overhead expenses, such as utilities or rent, which would be indicative of a bona fide business; (ii) most of the funds deposited in the Speed Staffing Accounts originated from accounts held in the name of shell entities that obtained funds through fraudulent transactions; and (iii) most of the debited transactions from the Speed Staffing Accounts were cash withdrawals and checks payable to **ABBAS**, which is not consistent with legitimate business operations.

11. As summarized in more detail in two examples set forth in paragraphs 12 through 22, below, the majority of the funds deposited into the Speed Staffing Accounts came from accounts held by shell entities that obtained those funds by fraudulent means. In certain circumstances, these accounts were open with synthetic identities.

**Example One:      ABBAS syphoned money into his personal account from the Hussain Accounts, into which proceeds of the Criminal Organization's fraudulent scheme had been deposited.**

12. On or about May 30, 2019, business accounts in the names Tandor Grill, Inc. and Fashion Chirp were opened at a branch of Victim Bank 1 located in or around Woodbridge, New Jersey, under the synthetic identity Sajjad Hussain (hereinafter, the "Hussain Accounts"). Although a synthetic identity

was used, based upon the investigation to date, law enforcement has determined that the Hussain Accounts were opened by CC-1.

13. The investigation has revealed that the Hussain Accounts were fraudulent for the following reasons: (i) the bank accounts were controlled by individuals other than the listed account holders; (ii) the underlying entities for the Hussain Accounts did not have bona fide places of business nor legitimate business activity; and (iii) the funds in Hussain Accounts were derived from fraudulent charge backs for which there was no prior legitimate purchases.

14. Specifically, the Hussain Accounts' bank records revealed that from on or about May 16, 2019 through on or about May 21, 2019, Nikki Boutique, a known shell entity in this investigation, issued eleven (11) fraudulent refund credits to the Hussain Accounts totaling approximately $182,300. These refund credits were fraudulent because the records reveal that they were not premised on any prior legitimate purchases. As part of the scheme, within minutes after the funds were fraudulently credited to the Hussain Accounts, the accounts were debited by Speed Staffing.

15. Thereafter, the Speed Staffing Accounts issued checks payable directly to **ABBAS**, which were deposited into **ABBAS**'s personal account. For example, on May 20, 2019, the Speed Staffing Account I issued a check for $7,000 to **ABBAS**'s personal account. This check was deposited into **ABBAS**'s personal account on the same day. Indeed, bank records show that checks were written on a monthly basis from the Speed Staffing Accounts to **ABBAS**'s personal account, ranging in amounts from $5,000 to $45,000.[4] From January 2019 through March 2020, **ABBAS** deposited approximately $183,000 in his personal account from the Speed Staffing Accounts – nearly the exact amount that was issued in fraudulent refund credits to the Hussain Accounts.

16. Accordingly, there is probable cause to believe that in furtherance of the conspiracy, **ABBAS** knowingly syphoned into his personal accounts funds that had been fraudulently deposited into the Hussain Accounts. Indeed, the investigation has revealed that: (i) Speed Staffing has not provided goods and services in exchange for payment, or otherwise engaged in legitimate commercial activity (ii) the timing of the fraudulent credits to the Hussain Accounts and the immediate debits by Speed Staffing is consistent with fraudulent activity; and (iii) **ABBAS**'s monthly checks to his personal account are not based on any legitimate work performed.

---

[4] As shown in the bank records and described in paragraph 24, there is probable to believe that **ABBAS** endorsed and deposited the checks from the Speed Staffing Accounts.

17. As a result of the fraudulent transactions described herein, the Hussain Accounts were overdrawn by hundreds of thousands of dollars, resulting in a total loss to Victim Bank 1 of approximately $247,459.

**Example Two:   ABBAS syphoned money into his personal account by overdrawing the Bhatti Accounts knowing that those accounts had insufficient funds.**

18. On or about September 11, 2019, business accounts in the names of Zizer Apparels, Inc. and Haveli Catering, Inc. were opened at a local branch of Victim Bank 2, located in or around East Brunswick, New Jersey, under the synthetic identity Sajid S. Bhatti. On or about the same day, business accounts in the names of Zizer Apparels, Inc. and Haveli Catering, Inc. were opened at a local branch of Victim Bank 3 located in or around South Brunswick, New Jersey under the synthetic identity Sajid S. Bhatti. (These accounts collectively are referred to as the "Bhatti Accounts.")

19. The investigation has revealed the Bhatti Accounts were fraudulent for the following reasons: (i) they were opened with a synthetic identity; (ii) they issued certified bank checks to Speed Staffing without sufficient funds to cover the amounts payable; and (iii) they purchased money orders made payable to Speed Staffing listing the synthetic identity discussed above, Sajjad Hussain, as the payor.

20. Based on financial records and the investigation to date, there is probable cause to believe that **ABBAS** fraudulently presented checks drawn on the Bhatti Accounts knowing that the Bhatti Accounts did not have the funds to cover the payable amounts of the checks. By depositing bad checks into the Speed Staffing Accounts, **ABBAS** took advantage of the float and withdrew the funds before Victim Banks could detect the fraudulent nature of the transactions. Law enforcement's review of bank records revealed a number of transactions from the Bhatti Accounts to Speed Staffing that were not indicative of any legitimate commercial or business activity.

21. Specifically, in and around October 2019, the Bhatti Accounts funded checks deposited into the Speed Staffing Accounts in the amount of approximately $33,000. On or about October 23, 2019, **ABBAS** withdrew approximately $25,000 from the Speed Staffing Accounts and deposited those funds into his personal account.

22. Moreover, during the same time period, eight postal money orders in the amount of $1,000 each were purchased from the Bhatti Accounts. Seven of the eight money orders listed synthetic identity Sajjad Hussain as the payor and Speed Staffing as the payee.

23. As a result of the fraudulent transactions described herein, the Bhatti Accounts were overdrawn by thousands of dollars causing losses to Victim Bank 2 and Victim Bank 3 of tens of thousands of dollars.

24. The investigation revealed that **ABBAS** controlled the Speed Staffing Accounts and withdrew funds that had been fraudulently deposited into those accounts. Among other things:

   a. In March 2020, a bank branch security camera captured **ABBAS** on multiple occasions withdrawing funds from the Speed Staffing Accounts II.

   b. During the investigation, CC-1 mailed a bank check to **ABBAS** to his known residence in the amount of $18,000, listing Speed Staffing as the payee. The check, which was deposited into the Speed Staffing Account I, was drawn on a bank account held in the name of a shell entity associated with the Criminal Organization.

   c. Most of the withdrawals from the Speed Staffing Accounts were either cash or checks payable to **ABBAS**, noting "Salary" in the memo line, even though Speed Staffing had no legitimate business operations, employees, or payroll. Indeed, as of March 2020, approximately $215,000 was credited to Speed Staffing Account I from shell entities related to this investigation, and approximately $216,000 was debited from the account mainly in the form of cash or checks payable to **ABBAS**.

25. The investigation also revealed that **ABBAS**'s role in the conspiracy was multifaceted. Aside from managing proceeds of the Criminal Organization through repository shell entities (such as Speed Staffing), **ABBAS** also functioned as the member of the Criminal Organization who created websites for the shell entities related to the Criminal Organization. The purpose of the websites was to provide an internet presence for the shell entities to give them the appearance of legitimacy when financial institutions performed background research. A review of documents obtained during the investigation revealed that an internet registrar account that **ABBAS** controlled registered over 60 website domains for shell entities operated by the Criminal Organization, including MS Car Repair, Shama Catering, Crummi, Inc. and others. Notably, there were approximately 12 web domains for known shell entities that were directly associated with the fraudulent activities of **NAVEED**. *See infra* Paragraphs 32 – 34 (discussing the bank accounts controlled by **NAVEED**, including but not limited to, True Value Little Ferry Hardware Corp. and Mughal Grill Corp.).

26. Based on the foregoing, there is probable cause to believe that **ABBAS** engaged in the Criminal Organization's criminal activity in furtherance of the conspiracy.

### IV. NAVEED Engaged in Fraudulent Refund Credit Transactions in Furtherance of the Conspiracy.

27. During the investigation, law enforcement identified **NAVEED** as a member of the Criminal Organization. The investigation revealed that **NAVEED** opened personal and business bank accounts under synthetic identities, including "Mir Ahmed" and "Shabeer Ali." Thereafter, these accounts received fraudulent refund credits from shell entities when no prior transaction had occurred. **NAVEED** and other coconspirators then withdrew these funds by taking advantage of the float and overdrew the payor account before the Victim Banks could identify the fraudulent nature of the transactions.

**Example One:** NAVEED used a synthetic identity, "Mir Ahmed," to engage in the fraudulent refund credit scheme.

28. In or around September 30, 2019, two personal accounts were opened at a branch of Victim Bank 1 located in or around New York City/Long Island area, under the synthetic identity "Mir Ahmed" (hereafter, the "Ahmed Accounts"). As detailed below, the investigation revealed that **NAVEED** controlled the Ahmed Accounts.

29. Specifically, law enforcement obtained a copy of a fraudulent Pakistani passport in the name of "Mir Ahmed."[5] Law enforcement then compared **NAVEED**'s known motor vehicle photograph and bank security cameras photographs taken of **NAVEED** with the photograph on the passport. There is probable cause to believe that the photograph of "Mir Ahmed" in the fraudulent Pakistani passport was **NAVEED**.

30. The investigation revealed that from October 26, 2019 through October 28, 2019, the Ahmed Accounts received fraudulent refund credits in the amount of $70,145 from Cofferty, LLC, a known shell entity in this investigation.[6] There is probable cause to believe that the refund credits were fraudulent because there were no prior transactions to refund. Furthermore, law enforcement's review of financial records revealed that the fraudulent refunds were immediately withdrawn upon being credited to the Ahmed

---

[5] During the investigation, law enforcement queried the passport in the name of "Mir Ahmed" and determined that the passport had never been used to gain entry in the United States, strongly suggesting that the passport is fictitious or otherwise fraudulent.

[6] There is probable cause to believe that Cofferty, LLC was a shell entity and had no legitimate business activities. The investigation revealed that Cofferty, LLC did not have a bona fide place of business or overhead expenses which would be indicative of legitimate business operations. To the contrary, financial records show that Cofferty, LLC issued numerous refund credits to shell entities associated with the Criminal Organization that were fraudulent and not predicated on actual prior purchases.

Accounts while they remained in "pending" status.  In connection with the fraudulent transactions described herein, **NAVEED** and members of the Criminal Organization overdrew the Ahmed Accounts by thousands of dollars, resulting in a total loss to Victim Bank 1 of approximately $35,070.

**Example Two:   NAVEED used a synthetic identity, "Shabeer Ali," to engage in the fraudulent refund credit scheme**.

31.   In addition to the synthetic identity Mir Ahmed, **NAVEED** used another fraudulent Pakistani passport with a synthetic identity in the name of "Shabeer Ali" to open bank accounts for other shell entities involved in the Criminal Organization.  Further, the investigation revealed that the passport has never been used to enter the country or used to apply for any type of visa to enter the country, indicating that the "Shabeer Ali" identity and passport were fictitious.

32.   In or around July 2018, two business accounts for True Value Little Ferry Hardware, Inc. and Mughal Grill, Corp. were opened at a branch of Victim Bank 4 located in or around Jersey City, New Jersey, under the name "Shabeer Ali" (hereafter, the "Ali Accounts").

33.   A review of financial records revealed that on or about July 30, 2018, the Ali Accounts received fraudulent refund credits from a company named SR Hair Salon totaling approximately $42,665.  There is probable cause to believe that these refunds were fraudulent and not predicated on actual prior purchases because, among other things: (i) the amount of the refund credits was not consistent with typical hair salon business; and (ii) there were no corresponding credits to the Ali Accounts indicative of actual purchases or services rendered.  As such, there is probable cause to believe that the Ali Accounts were fraudulent were used in furtherance of the Criminal Organization.

34.   The investigation revealed that **NAVEED** controlled the Ali Accounts and withdrew funds that had been fraudulently refunded to those accounts.  Examples of this activity are set forth below:

a.   On or about July 19, 2018 and on or about July 26, 2018, Victim Bank 4 security cameras captured **NAVEED** using the debit cards associated with the Ali Accounts at a bank branch located in or around New York, New York.  On that date, **NAVEED** deposited approximately $200.  The investigation revealed that the coconspirators often deposited relatively small amounts into shell entities' accounts as a method to avoid detection from Victim Banks and to create the appearance of legitimate business activity, when, in fact, the ultimate purpose was to overdraw the accounts in furtherance of the conspiracy.

b.       On or about July 31, 2018, a day after SR Salon issued the fraudulent refund credit to the Ali Accounts, Victim Bank 4 security cameras captured **NAVEED** using the debit cards associated with the Ali Accounts at a branch located in or around New York, New York. On that date, **NAVEED** withdrew approximately $9,010. On the same date, **NAVEED** purchased approximately $8,000 in cashier's check made payable to himself. The check was subsequently deposited in **NAVEED**'s personal account with Victim Bank 4.

35.       Additionally, coconspirator **ABBAS**, among others, benefited from fraudulent activity in the Ali Accounts. For example:

a.       On or about July 31, 2019, the Ali Accounts executed a peer–to-peer payment in the amount of $2,500 to a Victim Bank 4 account in the name of Syed Abbas, residing in Dublin, Ohio. The investigation revealed that the address associated with that account was the prior residence of **ABBAS**.

b.       On or about August 1, 2019, the Ali Accounts were debited by Speed Staffing in the amount of approximately $5,750. As discussed above, **ABBAS** was the signor on the Speed Staffing Accounts.

36.       As a result of the fraudulent transactions described herein, **ABBAS**, **NAVEED,** and other members of the Criminal Organization overdrew the Ali Accounts by thousands of dollars, resulting in a total loss to Victim Bank 4 of approximately $32,328.

V.       **Losses to the Victim Banks**

37.       As a direct result of **ABBAS'**s and **NAVEED**'s fraudulent activities and those of their coconspirators, the Victim Banks suffered financial losses totaling more than $1,005,000.